# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF TENNESSEE
### AT KNOXVILLE

|  |  |  |
|---|---|---|
| RODNEY NEWMAN DILLINGHAM and | ) | |
| WILLIAM MICHAEL MILLS, | ) | |
| | ) | |
|     Plaintiffs, | ) | |
| | ) | |
| v. | ) | No. 3:07-CV-214 |
| | ) | (Phillips) |
| BRIAN MILLSAPS, individually and | ) | |
| in his official capacity as a sergeant for | ) | |
| Monroe County Sheriff's Department; | ) | |
| KEITH McLEMORE, individually and | ) | |
| in his official capacity as a deputy Sheriff | ) | |
| for the Monroe County Sheriff's Department; | ) | |
| WILLIAM BIVENS, individually and in | ) | |
| his capacity as Sheriff of Monroe County, | ) | |
| Tennessee; and MONROE COUNTY, | ) | |
| TENNESSEE, | ) | |
| | ) | |
|     Defendants. | ) | |

## MEMORANDUM AND ORDER

This matter is before the Court on the Motion for Summary Judgment [Doc. 67] filed by

Sheriff William Bivens[1] ("Sheriff Bivens") and Monroe County (collectively, "Defendants"). On

June 1, 2007, plaintiffs Rodney Dillingham ("Dillingham") and William Mills ("Mills")

(collectively, "Plaintiffs") filed this civil rights action under 42 U.S.C. § 1983. Plaintiffs allege that

Defendants violated several of their constitutional rights, including the Fourth Amendment of the

United States Constitution. In particular, Plaintiffs allege that Deputy Sheriff Brian Millsaps[2]

---

[1] Defendants state that Sheriff Bivens's first name is "Bill," not "William."

[2] There is some confusion about whether Brian Millsaps is a Deputy Sheriff or a Sergeant at the Monroe County Sheriff's Department. In their Amended Complaint [Doc. 42], Plaintiffs refer to Brian Millsaps as "Sergeant" for the Monroe County Sheriff's Department. In contrast, Defendants refer to Brian

1

("Deputy Millsaps") and Deputy Sheriff Keith McLemore ("Deputy McLemore") used "excessive force" in violation of the Fourth Amendment. Plaintiffs also claim that Sheriff Bivens should be held supervisorily liable for this conduct, and that Monroe County should be held liable for having a "custom" or "policy" authorizing the use of "excessive force."

Plaintiffs have also brought Section 1983 claims based upon Fifth and Sixth Amendment violations, but those claims are not presently before the Court.[3] Instead, the Court will be reviewing Plaintiffs' "excessive force" clams against Sheriff Bivens in his individual capacity and Monroe County. Because Sheriff Bivens was not present during the alleged incident, he may only be liable under a theory of "supervisory" liability. To reach this question, however, the Court must first address Plaintiffs' underlying "excessive force" claims against Deputy Millsaps and Deputy McLemore. Obviously, Sheriff Bivens can only be liable if the underlying conduct was unconstitutional. Consequently, even though Deputy Millsaps and Deputy McLemore did not join in the Motion for Summary Judgment [Doc. 67], the Court must still address Plaintiffs' "excessive force" claims against them in their individual capacities. After the Court reviews Plaintiffs' "excessive force" claims against Deputy Millsaps, Deputy McLemore, and Sheriff Bivens (all in their individual capacities), the Court will then determine whether Monroe County–acting through the Monroe County Sheriff's Department–had a "custom" or "policy" encouraging the use of

---

Millsaps as "Deputy Sheriff." For purposes of this Memorandum and Order, the Court will refer to Brian Millsaps as "Deputy Millsaps."

[3] While Defendants have moved to dismiss "all" of Plaintiffs' Section 1983 claims [*See* Defendants' Memorandum of Law in Support of their Motion for Summary Judgment, Doc. 69, at 9], they only discuss Plaintiffs' Section 1983 claims based upon "excessive force" and their state law claims. Consequently, because Defendants have failed to raise any argument regarding Plaintiffs' other claims, the Court will not address them.

"excessive force."  Finally, the Court will address Plaintiffs' state law claims against Monroe County and Sheriff Bivens in his individual capacity.

Based upon the following, the Motion for Summary Judgment [Doc. 67] is **GRANTED**, whereby the Court makes the following rulings:

- There is a genuine issue of material fact regarding Dillingham's Section 1983 claim based upon a Fourth Amendment violation against Deputy Millsaps and Deputy McLemore in their individual capacities.  Specifically, there is a genuine issue of material fact regarding whether Deputy Millsaps and Deputy McLemore used "excessive force" in violation of the Fourth Amendment.

- Mills's Section 1983 claim based upon a Fourth Amendment violation against Deputy Millsaps in his individual capacity is **DISMISSED WITH PREJUDICE**.

- Mills's Section 1983 claim based upon an Eighth Amendment violation against the Defendants is **DISMISSED WITH PREJUDICE**.

- Dillingham's Section 1983 claim based upon an Eighth Amendment violation against the Defendants is **DISMISSED WITH PREJUDICE**.

- Dillingham's Section 1983 claim based upon a Fourteenth Amendment violation against Deputy Millsaps and Deputy McLemore in their individual capacities is **DISMISSED WITH PREJUDICE**.

- Mills's Section 1983 claim based upon a Fourteenth Amendment violation against Deputy Millsaps in his individual capacity is **DISMISSED WITH PREJUDICE**.

- Mills's Section 1983 claims based upon a Fourteenth Amendment violation against Monroe County and Sheriff Bivens in his individual capacity are **DISMISSED WITH PREJUDICE.**

- Dillingham's Section 1983 claim based upon a Fourth Amendment violation against Sheriff Bivens in his individual capacity is **DISMISSED WITH PREJUDICE**.

- Dillingham's Section 1983 claim based upon a Fourth Amendment violation against Monroe County is **DISMISSED WITH PREJUDICE**.

- Plaintiffs' state law claims against Monroe County are **DISMISSED WITH PREJUDICE**.

- Plaintiffs' state law claims against Sheriff Bivens in his individual capacity are **DISMISSED WITH PREJUDICE**.

3

# I. BACKGROUND

On May 11, 2007, Plaintiffs and others were camping at a lake near their home on Miller Road in Monroe County, Tennessee. Around 11:00 p.m., after they had been drinking alcohol for a while, Plaintiffs decided to leave and pick up Dillingham's wife. Two other individuals, Joe Holloway ("Holloway") and an unknown person ("John Doe"), decided to leave with Plaintiffs. Leaving the campsite, the men proceeded down Miller Road with John Doe driving, Mills in the front passenger seat, and Dillingham and Holloway in the back seat. At some point, the vehicle veered off the right side of the road, went down an embankment, and flipped over. Plaintiffs were rendered unconscious.

Mills awoke first and found himself in the car along with Dillingham and Holloway. John Doe, the driver of the car, was nowhere to be found. Realizing that his leg was broken, Mills woke Dillingham to help him out of the car. Mills also attempted to wake Holloway, but Holloway had sustained a serious head injury, and would remain unconscious for several days following the accident.

Dillingham suffered only cuts and bruises, and was able to help Mills out of the car. Once out, Mills attempted to stand, but instead fell down the embankment and blacked out again. Around this same time, a passing motorist stopped by. At this point, Dillingham asked the motorist to call for help. Following this interaction, Dillingham fell back down the embankment himself. Shortly thereafter, deputies from the Monroe County Sheriff's Department ("Sheriff Department") and emergency medical personnel arrived.

## A. Mills's Allegations

Mills claims that he was lying on the ground, unconscious, when he was awakened by something striking his right leg. [Mills Dep., Doc. 69-2, at 7, 26:11-15, Sep. 27, 2010]. Upon opening his eyes, Mills claims that he saw Deputy Millsaps move his right leg back into a standing position. [Id. at 10, 37:20-21]. Mills screamed and asked Deputy Millsaps why he "kicked" him. [Id. at 7, 26:14-20]. Defendants, however, state that Deputy Millsaps only nudged Mills's leg. [Defendants' Memorandum in Support of their Motion for Summary Judgment, Doc. 69, at 7].

Deputy Millsaps then asked Mills about the car accident, specifically, how many people were in the car. [Mills Dep., Doc. 69-2, at 7, 26:14-20]. Mills told the deputy that his leg was broken[4], at which point, according to Mills, Deputy Millsaps simply walked away.[5] [Id. at 8, 32:1-4]. After Deputy Millsaps walked away, emergency medical services ("EMS") began tending to Mills. [Id. at 10, 39:3-15]. They strapped Mills to a backboard, carried him up the embankment, and placed him on the road behind an ambulance. [Id.]. This is when Mills claims that he heard Dillingham screaming in pain. [Id. at 9, 34:21-36:17]. According to Mills, it sounded as though Dillingham was being attacked. [Id.]. However, Mills admits that he could not see what was happening. [Id.]. Because he could only hear Dillingham, Mills does not know if Dillingham was fighting with emergency personnel or law enforcement. [Id.]. During his deposition testimony, Mills was asked if he heard anyone tell Dillingham to stop fighting. [Id. at 9, 36:20-23]. Mills states that he could not remember because he "wasn't really focusing on any of that." [Id.].

---

[4] According to Mills, it would have been obvious that his leg was broken based on the way it was positioned. [Mills Dep., Doc. 69-2, at 8, 32:6-8]. However, it should be noted that there was no compound fracture and that Mills was wearing blue jeans. [Id. at 8, 32:10-22].

[5] Mills admits that Deputy Millsaps never tasered him or physically touched him. [Mills Dep., Doc. 69-2, at 9, 33:2-4]. Mills's "excessive force" claim is therefore directed solely to Deputy Millsaps.

5

At some point after Mills overhead the incident involving Dillingham, he was loaded onto a stretcher behind the ambulance and approached by Deputy McLemore. [Id. at 9, 33:17-34:4]. This was the first time that Mills encountered Deputy McLemore. [Id.]. Deputy McLemore never touched Mills, and only asked questions about the car accident. [Id.]. This was Mills's only contact with Deputy McLemore. [Id.]. As such, Mills makes no allegations with respect to Deputy McLemore. [Id.].

After his encounter with Deputy McLemore, Mills was taken by ambulance to the University of Tennessee Medical Center. [Id. at 13, 51:2-52:16]. Once there, Mills was diagnosed with a fractured right femur and underwent surgery the following day. [Id.]. Mills spent approximately one week in the hospital before being released. [Id.].

### B.     Dillingham's Allegations

While the record is not clear, it appears that during the initial encounter between Mills and Deputy Millsaps, emergency personnel were tending to Dillingham. According to his deposition testimony, when Deputies Millsaps and McLemore approached Dillingham, he was still down the embankment, but EMS were in the process of securing him on a backboard. [Dillingham Dep., Doc. 69-1, at 34, 136:17-138:7, Dec. 16, 2010]. Dillingham claims that the deputies began interrogating him about the car accident, specifically asking about the driver of the vehicle. [Id.]. When he replied that he did not know who was driving, the deputies allegedly told everyone around to "look at the stars." [Id.]. This, Dillingham states, is when the deputies began to beat and "taser" him.[6] [Id.].

---

[6] As the Court of Appeals for the Sixth Circuit has explained, a "taser" is "an electronic devise used to subdue violent or aggressive individuals. By pressing a lever, a high voltage electrical current is transmitted through a wire to the target." Landis v. Baker, 297 F. App'x 453, 456 n.4 (6th Cir. 2008) (quotations and citation omitted).

6

Dillingham claims that he was immobilized on the backboard as the deputies beat and tasered him, all while continuing to question about who was driving the vehicle. [Id. at 35, 137:1-144:18]. Allegedly, the deputies held a flashlight in Dillingham's face so that he could not see them as they hit, kicked, and tasered him repeatedly. [Id.]. Dillingham claims that Deputy McLemore hit him in the face with a flashlight and kicked him in the side. [Id.]. He also alleges that Deputy Millsaps stood on his testicles, and repeatedly tasered his testicles and stomach.[7] [Id.]. While Dillingham claims that he was not combative with law enforcement officers or medical personnel, he admits that the officers told him to stop fighting and to cooperate. [Id. at 38, 148:8-149:21].

Although he does not know the exact amount of time, Dillingham believes that the beating lasted around thirty minutes. [Id. at 35, 137:7-16]. Dillingham claims that he suffered bruising, neck pain, back pain, fractures, missing teeth, and taser burns. [Id. at 39, 153:15-156:19]. Dillingham provided pictures at his deposition that apparently depicted these injuries. [Id.]. However, aside from the taser marks, it is unclear from the record which injuries, if any, were the result of the car accident, or if most of the injuries were related to the alleged beating. Notably, Dillingham admits that he received some cuts on his head and face as a result of the accident. [Id.].

Following the car accident, Dillingham was transported to the University of Tennessee Medical center, where he remained for around five days. [Id. at 40, 159:11-160:24]. Unfortunately, the record does not indicate what injuries he was diagnosed with, or what treatment he was given.

---

[7] It should be noted that Dillingham's deposition testimony paints an unclear picture about which deputy did what. At first Dillingham claims that Deputy McLemore beat and tasered him. [Dillingham Dep., Doc. 69-1, at 34, 136:22-144:18]. Then Dillingham claims that it was Deputy Millsaps who beat and tasered him while Deputy McLemore held the flashlight. [Id.]. Next Dillingham claims that Deputy McLemore might have hit him in the mouth with the flashlight or kicked him in the side. [Id.]. Then Dillingham claims that it was both deputies who tasered him. [Id.]. Lastly, Dillingham claims that Deputy Millsaps is the deputy who repeatedly tasered him in his testicles and side. [Id.].

However, Dillingham claims that his doctors encouraged him to seek a specialist for back injuries following his medical discharge. [Id.]. In addition, Dillingham claims that he continues to suffer from pain and memory loss related to his injuries. [Id. at 1, 7:22-8:1; at 8, 30:11-19].

### C. Deputy Millsaps

Deputy Millsaps disputes Dillingham's account of the events. In particular, Deputy Millsaps claims that he only used force because Dillingham was being combative.[8] [Deputy Millsaps Dep., Doc. 78-1, at 11, 25:23-25]. According to Deputy Millsaps, only Dillingham's legs were strapped down, not his whole body, and it appeared that Dillingham was trying to hit the emergency personnel. [Id. at 11, 26:9-22]. Deputy Millsaps also denies that he kicked Dillingham, stepped on his testicles, or used his flashlight. [Id. at 10, 25:14-18]. Notwithstanding, Deputy Millsaps does admit that he used the taser on Dillingham. [Id.]. Dillingham was apparently not suffering from significant injuries at the time. [Id. at 13, 28:9-17]

According to Deputy Millsaps, Dillingham did not comply with his verbal commands to stop fighting with the medical personnel. [Id. at 15, 30:24-31:13]. Instead, Dillingham kept "flailing" his fists at emergency workers. [Id.]. In response to the alleged combative behavior, Deputy Millsaps tasered Dillingham once in the upper body. [Id. at 10, 25:14-17; at 16, 31:19-32:6]. Deputy Millsaps states that he tasered Dillingham only once because it did not work, and because he did not want to risk hurting himself or Dillingham by doing it again.[9] [Id. at 16, 31:19-32:6]. Further, Deputy Millsaps states that Deputy McLemore was next to his side during the tasering and

---

[8] The record contains no testimony from Deputy McLemore.

[9] Although tasers generally record the date, time, and duration of each use, that information has not been provided in the record.

that he (Deputy Millsaps) never told anyone to turn away prior to using his taser. [Id. at 13, 28:18-20, at 14, 29:11-13].

Following the incident, Dillingham and Mills filed formal complaints with the Sheriff's Department. [Defendants' Statement of Material Facts, Doc. 70, at 3, ¶ 20]. Although it is not clear why, Deputy Millsaps was discharged following his interview with department investigators.[10] [Id. at ¶ 22]. The District Attorney was notified about the complaints and the Tennessee Bureau of Investigation ("TBI") conducted their own investigation. [Id. at 4, ¶ 29]. Ultimately, a grand jury refused to indict either of the deputies. [Id.].

Deputy Millsaps further testified about his training on the appropriate use of force. [Id. at 4, 6:2-5, at 6, 11:4-6]. Deputy Millsaps graduated from the Tennessee Law Enforcement Training Academy (the "Academy") in 1996 where he received training on the use of force. [Id.]. At the time of the incident (May 11, 2007), Deputy Millsaps was in good standing with the Sheriff's Department and had not received any complaints. [Sheriff Bivens Affidavit, Doc 68, at 3, ¶ 5]. Deputy Millsaps was also up to date on his annually-required forty hours of continuing education. [Bivens Affidavit, Doc 68, at 3, ¶ 5]. Additionally, Deputy Millsaps states that he received training at the Academy on how to deal with belligerent individuals. [Deputy Millsaps Dep., Doc. 78-1, at 8, 13:5-16]. This training was refreshed every couple of years. [Id.]. Despite receiving this training, Deputy Millsaps admits that he never received, or saw, a copy of the Monroe County Sheriff's Department Policy Manual ("Policy Manual"). [Id. at 5, 9:2-7].

Deputy Millsaps also attended a taser training class in the fall of 2006 that lasted four to eight hours. [Id. at 6, 11:10-18]. During this class, he was instructed on the appropriate use of force,

---

[10] Deputy McLemore was also discharged for failing to show up for his required interview. [Defendants' Statement of Material Facts, Doc. 70, at 3, ¶ 21].

both generally and specifically with regard to using tasers. [Id. at 6, 11:7-12]. For example, Deputy Millsaps was taught that using a taser is appropriate when a person does not respond to verbal commands and is being combative. [Id. at 8, 13:17-14:12].

### D. Sheriff Bivens

Sheriff Bivens, by his own affidavit, states that he was not at the scene of the accident, and that he has never had any contact with the Plaintiffs. [Sheriff Bivens Affidavit, Doc. 68, at 2, ¶ 4]. Plaintiffs also confirm that they have never spoken with Sheriff Bivens, or had contact with him. [Plaintiffs' Responses to Defendants' Statement of Material Facts, Doc. 74, at 5, ¶ 19]. Additionally, Sheriff Bivens claims that he is unaware of any previous complaints being filed against Deputies Millsaps and McLemore. [Sheriff Bivens Affidavit, Doc. 68, at 3, ¶ 6]. Although it is disputed by Deputy Millsaps, Sheriff Bivens claims to have provided both deputies with copies of the Policy Manual. [Id. at 3, ¶ 5]. Sheriff Bivens also states that both deputies were up to date on their required forty hours of inservice. [Id.].

It was only after Dillingham and Mills filed their complaints that Sheriff Bivens learned about the incident. [Id. at 2, ¶ 4]. Sheriff Bivens attempted to interview Deputies Millsaps and McLemore about the complaints. [Id. at 4, ¶ 7]. However, Deputy McLemore did not appear and was discharged. [Id.]. While Deputy Millsaps did provide an interview, he was discharged as a result of some confusion about the interview process. [Id.]. According to Sheriff Bivens, he has never made a finding that the incident happened as Plaintiffs allege. [Id. at 4, ¶ 8]. Instead, he states that the deputies were discharged for failing to follow the internal investigation procedures. [Id.]. As previously mentioned, Sheriff Bivens notified the District Attorney who, after a TBI

10

investigation, presented the case to a grand jury that ultimately decided not to indict the two deputies.  [Id. at 4, ¶ 9].

## II.    STANDARD OF REVIEW

Under Rule 56 of the Federal Rules of Civil Procedure, summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  In considering a motion for summary judgment, a court must construe the facts and draw all inferences therefrom in the light most favorable to the party opposing the motion.  Matsushita Elec. Indus. Co. v. Zendith Radio Corp., 475 U.S. 574, 587 (1986).  A genuine issue of material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

The moving party bears the initial burden of establishing that there is no genuine issue of material fact.  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  The central inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law."  Anderson, 477 U.S. at 251-52.  The burden then shifts to the non-moving party to demonstrate the existence of genuine issues of material fact. Celotex, 477 U.S. at 324.  The non-moving party must present "significant probative evidence" to show that there is more than "some metaphysical doubt as to the material facts."  Moore v. Phillip Morris Co., 8 F.3d 335, 339-40 (6th Cir. 1993).  Notably, the Court "is not required to speculate on which portion of the record the nonmoving party relies, nor is it obligated to wade through and search the entire record for some specific facts that might support the nonmoving party's claim."

InterRoyal Corp. v. Sponseller, 889 F.2d 108, 111 (6th Cir. 1989). If the non-moving party fails to meet this burden, the moving party is entitled to summary judgment.

## III.   ANALYSIS

### A.   Plaintiffs' Section 1983 Claims Based Upon "Excessive Force"

#### 1.   Defining the Parties

In addressing civil rights claims brought under 42 U.S.C. § 1983, courts must always begin with the following question: who did the plaintiff sue, and in what capacity? This is an important question, as it determines what the plaintiff must prove, and what defenses are available. In the present case, Plaintiffs have sued three local government officers: Sheriff Bivens, Deputy Millsaps, and Deputy McLemore. Plaintiffs have sued the officers in their individual and official capacities. Based upon the capacity, Plaintiffs will have different burdens of proof,[11] and Defendants will have different defenses.[12] To the extent that Plaintiffs have sued Sheriff Bivens, Deputy Millsaps, or

---

[11]  In Monell v. Department of Social Services of New York, the Supreme Court recognized that local government units (and local government officers and officials) may be sued under 42 U.S.C. § 1983, and that they are not part of the "State" for purposes of Section 1983 liability. 436 U.S. 658, 691 (1978). The Court also stated that when local government officials are sued in their official capacity, it should be treated as suits against the local government unit: "Since official-capacity suits generally represent only another way of pleading an action against an entity of which an officer is an agent . . . our holding today that local government can be sued under § 1983 necessarily decides that local government officials sued in their official capacities are 'persons' under § 1983 in those cases in which, as here, a local government would be suable in its own name." Id. at 691 n.55. As the Supreme Court later explained in Kentucky v. Graham, "[a]s long as the government entity receives notice and an opportunity to respond, an official-capacity suit is, in all respects other than name, to be treated as a suit against the entity. It is not a suit against the official personally, for the real party in interest is the entity. Thus, while an award of damages against an official in his personal capacity can be executed only against the official's personal assets, a plaintiff seeking to recover on a damages judgment in an official-capacity suit must look to the government entity itself." 473 U.S. 159, 166 (1985) (citations omitted).

[12]  Municipal (or local government) officers are "insulated by the 'qualified' or 'good faith' immunity doctrine from exposure to 'individual capacity' lawsuits anchored in a discretionary official decision if 'their conduct does not violate clearly established [federal] statutory or constitutional rights of which a reasonable person would have known,' even if their actions actually violated the plaintiff's federal rights." Von Herbert v. City of St. Clair Shores, 61 F. App'x 133, 141 (6th Cir. 2003) (internal citations omitted). The "qualified immunity" defense is not available in official-capacity suits, which are treated as

Deputy McLemore, in their official capacities, that is nothing more than a suit against Monroe County. *See, e.g.*, <u>Leach v. Shelby Cnty.</u>, 891 F.2d 1241, 1245-46 (6th Cir. 1989) ("[The plaintiff's] suit against the Mayor and the Sheriff of Shelby County in their official capacities is, therefore, essentially and for all purposes, a suit against the County itself."); <u>Petty v. Cnty. of Franklin</u>, 478 F.3d 341, 349 (6th Cir. 2007) ("To the extent that [the plaintiff's Section 1983] suit is against [the sheriff] in his official capacity, it is nothing more than a suit against Franklin County itself.") (citing <u>Kentucky v. Graham</u>, 473 U.S. 159, 166 (1985) ("[A]n official capacity suit is, in all respects other than name, to be treated as a suit against the entity.")).

In addition to suing three individuals, Plaintiffs have sued Monroe County–which includes the Monroe County Sheriff's Department.[13]  For purposes of Section 1983, Monroe County is considered a municipal (or local) government. *See, e.g.*, <u>Leach</u>, 891 F.2d at 1245-46.

### 2. Only Dillingham Has Standing to Bring a Fourth Amendment Claim

To state a claim under 42 U.S.C. § 1983, the plaintiff must establish "(1) that [the] defendant was acting under color of state law, and (2) the offending conduct deprived the plaintiff of rights secured under federal law." <u>Mezibov v. Allen</u>, 411 F.3d 712, 716 (6th Cir. 2005).  As an initial matter, the Court must determine whether the Plaintiffs have standing to bring a claim under the

---

suits against the entity. <u>Id</u>.  Rather, the "qualified immunity" defense exonerates individual-capacity defendants from liability for their discretionary judgments. <u>Sheets v. Mullins</u>, 287 F.3d 581, 686 (6th Cir. 2002).  Once the defense is raised, the "ultimate burden of proof is on the plaintiff to show that the defendants are not entitled to qualified immunity." <u>Rich v. City of Mayfield Hts.</u>, 955 F.2d 1092, 1095 (6th Cir. 1992) (citations omitted).

[13]  There are two ways of referring to Plaintiffs' claims against Monroe County.  They may be referred to as claims against "Sheriff Bivens in his official capacity as Sheriff of the Monroe County Sheriff's Department," or they may be referred to as claims against "Monroe County." *See, e.g.*, <u>Petty v. Cnty. of Franklin</u>, 478 F.3d 341, 349 (6th Cir. 2007).  It makes no difference in the Court's analysis.

Fourth Amendment.[14] The Plaintiffs will only have standing if they were "seized" during the alleged "excessive force." *See, e.g.,* Smoak v. Hall, 460 F.3d 768, 778 (6th Cir. 2006) (recognizing that the "safeguards of the Fourth Amendment, with respect to police/citizen contact, vest only after a citizen has been seized") (citation and internal quotation marks omitted). A seizure occurs when, "in view of all the circumstances surrounding the incident, a reasonable person would have believed he was not free to leave." United States v. Mendenhall, 446 U.S. 544, 554 (1980).

Generally, a "seizure" occurs in two ways: (1) through the use of physical force by the officer; or (2) through "show of authority" by the officer, in which the suspect actually submits. *See* Peete v. Metro. Gov't of Nashville & Davidson Cnty., 486 F.3d 217, 220 (6th Cir. 2007) (citing Scott v. Harris, 550 U.S. 372 (2007)). The Court of Appeals for the Sixth Circuit ("Sixth Circuit") has recognized the following circumstances as indicative of a seizure: "'the threatening presence of several officers, the display of a weapon by an officer, some physical touching of the person of the citizen, or the use of language or tone of voice indicating that compliance with the officer's request might be compelled.'" United States v. Jones, 562 F.3d 768, 772 (6th Cir. 2009) (quoting Mendenhall, 446 U.S. at 554). Because Plaintiffs were not arrested following the car accident, the Court must look to other facts to determine whether they were "seized." In addition, the Court must analyze the standing question separately for each Plaintiff. *See* Rakas v. Illinois, 439 U.S. 128, 133-34 (1978) (citations omitted) ("Fourth Amendment rights are personal rights which, like some other constitutional rights, may not be vicariously asserted.").

First, the Court finds that Dillingham was seized for purposes of the Fourth Amendment. Notably, Deputy Millsaps admits that he shot Dillingham with a taser gun in an attempt to restrain

---

[14] Or more precisely, whether Plaintiffs have standing to bring a claim under 42 U.S.C. § 1983 premised upon the use of "excessive force" by Deputy Millsaps and Deputy McLemore in their individual capacities, in violation of the Fourth Amendment.

14

him.  Courts across the country, including the Sixth Circuit, have recognized that the use of tasers may constitute a "seizure" for purposes of the Fourth Amendment.  *See* Kijowski v. City of Niles, 472 F. App'x 595, 598-99 (6th Cir. 2010) (implicitly recognizing that the use of a taser twice constitutes a "seizure" for purposes of the Fourth Amendment); Landis v. Baker, 297 F. App'x 453, 463 (6th Cir. 2008) (recognizing that the multiple use of a taser, in combination with the use of a police baton, constitutes a "seizure" for purposes of the Fourth Amendment); Bryan v. MacPherson, 630 F.3d 805, 810 (9th Cir. 2010) (finding that the use of tasers and similar devices constitutes an "intermediate, significant level of force that must be justified by the governmental interests involved") (citation omitted); Orem v. Rephann, 523 F.3d 442, 447-48 (4th Cir. 2008) (rejecting the contention that a taser constitutes a *de minimus* level of force); Hickey v. Reeder, 12 F.3d 754, 757 (8th Cir. 1993) ("We find defendants' attempt, on appeal, to minimize the pain of being shot with a stun gun . . . to be completely baseless.  The defendants' own testimony reveals that a stun gun inflicts a painful and frightening blow, which temporarily paralyzes the large muscles of the body, rendering the victim helpless."); Crowell v. Kirkpatrick, 667 F. Supp. 2d 391, 408 (D. Vt. 2009) (recognizing that tasers have "been described by other courts as 'moderate, non-lethal force" and cause "acute–even severe–physical pain").  It does not matter whether Dillingham was combative (that fact is only relevant to whether the officers' force was "reasonable" under the Fourth Amendment); the point is that the deputy sheriffs used physical force to restrain a person against his will.  That is the very definition of a "seizure": intentionally restricting a person's physical movement.  Considering the facts as a whole, and viewing the evidence in the light most favorable to Dillingham, the Court finds that a reasonable person in Dillingham's position would "have believed he was not free to leave."  Mendenhall, 446 U.S. at 554.  Accordingly, the Court finds that

15

Dillingham was "seized," and therefore has standing to bring a Fourth Amendment claim under 42 U.S.C. § 1983.

Second, the Court finds that Mills was not seized for purposes of the Fourth Amendment. Having reviewed the record, there is no evidence that Deputy Millsaps or Deputy McLemore restrained Mills by "show of authority." After Deputy Millsaps and Deputy McLemore arrived at the scene, Deputy Millsaps questioned Mills about the car accident (and specifically, about the driver of the vehicle who was no longer present).[15] There is no evidence that Deputy Millsaps was forceful, abrasive, or controlling with Mills. There is no evidence that Deputy Millsaps pointed a weapon at Mills, or threatened him in some manner. Deputy Millsaps simply asked questions about the car accident; he was not interrogating him or accusing him of criminal liability. There is no evidence that it went beyond general questioning. As the Supreme Court has made clear, general questioning by the police in public does not constitute a "seizure." *See* Florida v. Bostick, 501 U.S. 429, 434 (1991) ("Our cases make it clear that a seizure does not occur simply because a police officer approaches an individual and asks a few questions. . . . 'Only when the officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen may we conclude that a 'seizure' has occurred.'") (quoting Terry v. Ohio, 392 U.S. 1, 19 n. 16 (1968)). *See also* United States v. Jahkur, 409 F. Supp. 2d 28, 30-31 (D. Mass. 2005) (finding that a plaintiff who had just been in a car accident was not seized, even though he was questioned by police officers, because the questioning only amounted to "general questioning" and therefore was a consensual encounter).

---

[15] By his own testimony, Mills admits that Deputy McLemore did not physically touch him or question him in an abrasive manner. Thus, Mills's Fourth Amendment "excessive force" claim is based solely upon the alleged "kicking" by Deputy Millsaps. Consequently, the Court will focus exclusively on Deputy Millsaps's actions in determining whether Mills was "seized."

Moreover, the fact that Deputy Millsaps and Deputy McLemore "controlled" the environment–they were investigating a car accident–makes no difference. As the Sixth Circuit has recognized, "[t]he distinguishing feature of a seizure is the restraint of the subject's liberty–specifically, his or her freedom to walk away. Control [by law enforcement] over one's environment does not establish a seizure unless that control somehow restricts the subject's physical liberty." Ewolski v. City of Brunswick, 287 F.3d 492, 507 (6th Cir. 2002). Even though Deputy Millsaps and Deputy McLemore had control over the environment, that does not mean that they restricted Mills's physical liberty. Even if Deputy Millsaps "nudged" or "kicked" Mills's leg, there is no evidence that it was done to restrain him from leaving the scene. Mills could not walk away because he had a broken leg; it was not because law enforcement prevented him from doing so. In other words, the fact that Mills did not leave the scene does not mean that he submitted to authority. His movement was restrained by his own condition, not by law enforcement.

Mills's entire Fourth Amendment claim against Deputy Millsaps rests upon his broken leg being "kicked." At this time, however, Dillingham had not yet started screaming in response to the taser or other force being applied. Because Mills was unaware of his surroundings at the time he was allegedly kicked, there is no reason to think that he was somehow influenced–that is, decided to submit to authority–based upon what was happening to Dillingham. Consequently, the Court does not find that a reasonable person in Mills's situation would have felt restrained from leaving the scene **based upon the actions** of law enforcement. It was his condition–not law enforcement–that made him incapable of leaving. Accordingly, the Court finds that Mills does not have standing to bring a Fourth Amendment "excessive force" claim under 42 U.S.C. § 1983. Consequently, Mills's Fourth Amendment "excessive force" claims against Sheriff Bivens in his

17

individual capacity, Deputy Millsaps in his individual capacity, Deputy McLemore in his individual capacity, and Monroe County, are **DISMISSED WITH PREJUDICE**.

### 3. Plaintiffs' Eighth Amendment Claims are Dismissed

To the extent that Plaintiffs have asserted "excessive force" claims under the Eighth Amendment, [Plaintiffs' Amended Complaint, Doc. 42, at 5, ¶ 28], those claims are dismissed. In order to raise an Eighth Amendment "excessive force" claim, (which falls under the category of "cruel and unusual punishment"), the plaintiff must have suffered an injury as a prisoner. *See* Aldini v. Johnson, 609 F.3d 858, 864 (6th Cir. 2011) (citations omitted); Whitley v. Albers, 475 U.S. 312, 318 (1986) (recognizing that the Eighth Amendment "was designed to protect those convicted of crimes and consequently . . . applies only after the State has complied with constitutional guarantees traditionally associated with criminal prosecutions") (citation and internal quotations omitted); Phelps v. Coy, 286 F.3d 295, 299-300 (6th Cir. 2002) ("Which amendment applies depends on the status of the plaintiff at the time of the incident, whether free citizen, convicted prisoner, or something in between. . . . If the plaintiff was a free person . . . and the use of force occurred in the course of an arrest or other seizure . . . [then] the plaintiff's claim arises under the Fourth Amendment and its reasonableness standard.") (internal citations omitted). When Dillingham and Mills were questioned by the officers, they were obviously not prisoners. Consequently, to the extent that Plaintiffs have asserted Eighth Amendment "excessive force" claims, those claims are **DISMISSED WITH PREJUDICE**.

### 4. Dillingham's Fourteenth Amendment Substantive Due Process Claim is Dismissed

18

In their Amended Complaint [Doc. 42], Plaintiffs allege that "[t]he battery, taser 'shocking,' and other misconduct by defendants Millsaps and McLemore violated the substantive Due Process rights of the Plaintiffs guaranteed by the 14th Amendment." [Plaintiffs' Amended Complaint, Doc. 42, at 5, ¶ 26]. However, as the Court previously explained, Dillingham's claims based upon "excessive force" must be analyzed under the Fourth Amendment, not the Eighth or Fourteenth Amendments, because he was "seized" during the alleged incident. *See* Rodriguez v. Passinault, 637 F.3d 675, 680 n.4 (6th Cir. 2011) ("Where a plaintiff complains of an unreasonable seizure, the claim is more properly analyzed under the Fourth Amendment than the Fourteenth Amendment's substantive due process provision, since the former is a 'more explicit textual source of constitutional protection.'") (quoting Graham v. Connor, 490 U.S. 386, 395(1989)); Reiff v. Marks, No. 08-CV-05963, 2009 WL 2058589, at *3 (E.D. Pa. Jul. 15, 2009) (rejecting a substantive due process claim brought for conduct that allegedly occurred during an arrest because "the Court must follow Graham . . . and its progeny, which require the Court to analyze the alleged incident under the Fourth Amendment because, regardless of the label or caption, [the plaintiffs's] factual allegations amount to allegations of excessive force in the context of an arrest"). Accordingly, Dillingham's "substantive due process" claim (based upon "excessive force") under the Fourteenth Amendment is **DISMISSED WITH PREJUDICE**.

### 5. Mills's Fourteenth Amendment Substantive Due Process Claim is Dismissed

While Mills does not have standing to bring a claim under the Fourth Amendment–he was not "seized" following the car accident, *see* Part III.A.2–he may still bring an "excessive force" claim under the substantive due process clause of the Fourteenth Amendment. In Darah v. City of Oak Park, the Sixth Circuit recognized that "[w]hile excessive force claims are often best analyzed

19

under the Fourth Amendment's protection against unreasonable seizures," there may be instances in which a plaintiff is subjected to "excessive force," but was not "seized" at the time and therefore cannot rely upon the Fourth Amendment. 255 F.3d 301, 305-06 (6th Cir. 2001). Under these circumstances, "the substantive component of the Fourteenth Amendment's due process clause is the most appropriate lens with which to view an excessive force claim." Id. (citing Cnty. of Sacramento v. Lewis, 523 U.S. 833, 843-44 (1998)). *See also* Claybrook v. Birchwell, 199 F.3d 350, 359 (6th Cir. 2000) (recognizing that "constitutional tort claims asserted by persons collaterally injured by police conduct who were not intended targets of an attempted official 'seizure' are adjudged according to substantive due process norms") (citing Lewis, 523 U.S. 833).

Under this standard, plaintiffs will face "[a] substantially higher hurdle" than the Fourth Amendment's "objective reasonableness" test. Darrah, 255 F.3d at 306 (citations omitted). Rather, the substantive due process clause of the Fourteenth Amendment is not violated unless the alleged conduct "shocks the conscience." Lewis, 523 U.S. at 846. This, of course, will depend upon the facts and circumstances of each case. Id. at 851-53. Specifically, the Supreme Court held that in situations where the implicated government actors

> are afforded a reasonable opportunity to deliberate various
> alternatives prior to electing a course of action . . ., their actions will
> be deemed conscience-shocking if they were taken with 'deliberate
> indifference' towards the plaintiff's federally protected rights. In
> contradistinction, in a rapidly evolving, fluid, and dangerous
> predicament which precludes the luxury of calm and reflective pre-
> response deliberation . . ., public servants' reflexive actions 'shock
> the conscience' only if they involved force employed 'maliciously
> and sadistically for the very purpose of causing harm' rather than 'in
> a good faith effort to maintain or restore discipline.'

Id. at 852-53. Because the present case involves a situation in which Deputy Millsaps had a "reasonable opportunity to deliberate various alternatives prior to electing a course of action,"[16] he will be held liable if his actions were done with "deliberate indifference towards the plaintiff's federally protected rights." Id. at 853. See also Hunt v. Sycamore Comm. Sch. Dist. Bd. of Educ., 542 F.3d 529, 541 (6th Cir. 2008) (stating that "if the situation is an emergency, the heightened intent standard would apply, and if there is time to deliberate, the lower deliberate indifference standard would apply") (collecting cases in the Sixth Circuit). Even when viewing the facts in the light most favorable to Mills–the non-moving party–there is not a genuine issue of material fact regarding whether Deputy Millsaps acted with "deliberate indifference."

As a result of the car accident, Mills suffered a broken leg (fractured right femur) and was unconscious for a period of time. It is possible, even likely, that Deputy Millsaps touched Mills's leg in an attempt to wake him. At most, Deputy Millsaps was negligent in causing harm to Mills. While Mills claims that his leg was "obviously" broken, there was not a compound fracture, and he was wearing blue jeans (which may have obscured the injury). Combined with the fact that Mills was previously unconscious–and therefore could not state whether he was injured–it is entirely possible that Deputy Millsaps was unaware of the severity of Mills's injuries. While Deputy Millsaps may have made a mistake in touching Mills's leg, that is not the type of conduct that "shocks the conscience." As the Supreme Court made clear in Lewis, negligence is not enough to support a cause of action under the substantive due process clause. Id. at 849 (recognizing that "the Constitution does not guarantee due care on the part of state officials; liability for negligently

---

[16] This is not a case in which law enforcement agents had to make decisions in a time-pressured environment. While Deputy Millsaps and Deputy McLemore were investigating a car accident, there is no indication that it was an emergency, or that they were under some exceptional pressure. Notably, there were medical personnel at the scene tending to the injured passengers.

inflicted harm is categorically beneath the threshold of constitutional due process") (citations omitted). Rather, "[i]t is, on the contrary, behavior at the other end of the culpability spectrum that would most probably support a substantive due process claim; conduct intended to injure in some way unjustifiable by any government interest is the sort of official action most likely to rise to the conscience-shocking level." Id. (citation omitted). Given this high standard, and the lack of evidence showing that Deputy Millsaps was more than negligent, Mills's "substantive due process claim" (based upon "excessive force") under the Fourteenth Amendment is **DISMISSED WITH PREJUDICE.** In addition, Mills's substantive due process claims (based upon "excessive force") under the Fourteenth Amendment against Monroe County and Sheriff Bivens in his individual capacity–that is, for "failure to train"–are also **DISMISSED WITH PREJUDICE.** Having found that there was no underlying constitutional violation, Monroe County and Sheriff Bivens cannot be held liable. In Claybrook, the Sixth Circuit affirmed the dismissal of a Section 1983 claim against the county, based upon a substantive due process violation ("excessive force" in the form of "failure to train," as in the present case), after finding that there was no underlying unconstitutional conduct:

> Furthermore, because the charged official conduct did not inflict any constitutional deprivation upon Quintana, defendant Kirchner, in his official capacity as the Chief Executive Officer of the Nashville–Davidson County Metropolitan Police Department, cannot be liable to her for any alleged neglect to train or supervise those officers, or failure to develop appropriate deadly force policies . . .

199 F.3d at 361. The same holds true in this case.


6.      **The Court Must First Address Dillingham's Fourth Amendment Claims Against Deputy Millsaps and Deputy McLemore in their Individual Capacities**

22

As a basis for his Fourth Amendment claim against Sheriff Bivens in his individual capacity, Dillingham argues that Sheriff Bivens should be held supervisorily liable for the alleged "excessive force" used by Deputy Millsaps and Deputy McLemore. While Sheriff Bivens was not present during the incident, Plaintiffs may still hold him liable under a theory of "supervisory" liability.

However, before the Court can analyze Dillingham's claims against Sheriff Bivens in his individual capacity, the Court must first examine Dillingham's claims against Deputy Millsaps and Deputy McLemore in their individual capacities. Obviously, Sheriff Bivens can only be liable if the underlying conduct was unconstitutional. For those same reasons, Monroe County cannot be held liable if Deputy Millsaps's and Deputy McLemore's actions were constitutional. *See* City of L.A. v. Heller, 475 U.S. 796, 799 (1986) (*per curiam*) ("If a person has suffered no constitutional injury at the hands of the individual police officer, the fact that the departmental regulations might have authorized the use of unconstitutionally excessive force is quite beside the point."); Jones v. City of Cincinnati, 521 F.3d 555, 560 (6th Cir. 2008) ("A municipality cannot be held liable under § 1983 absent an underlying constitutional violation by its officer."). While Deputy Millsaps and Deputy McLemore did not join in the Motion for Summary Judgment [Doc. 67], the Court must still consider Dillingham's claims against them in their individual capacities. In addition, the Court must examine the individual actions of each officer separately. Gaddis v. Redford Twp., 364 F.3d 763, 772 (6th Cir. 2004).

> **7.** **Dillingham's Fourth Amendment Claim Against Deputy Millsaps and Deputy McLemore in their Individual Capacities: There is a Genuine Issue of Material Fact Regarding Whether Deputy Millsaps and Deputy McLemore Used "Excessive Force" in Violation of the Fourth Amendment**

When a plaintiff brings a claim of "excessive force" against an officer, and the plaintiff was "seized" at the time of the alleged incident, that claim is analyzed under the Fourth Amendment. Graham, 490 U.S. at 395. These claims are evaluated under the "objective reasonableness" standard, "which depends on the facts and circumstances of each case viewed from the perspective of a reasonable officer on the scene and not with 20/20 hindsight." Fox v. DeSoto, 489 F.3d 227, 236 (6th Cir. 2008) (citing Graham, 490 U.S. at 395-96. Relevant considerations include "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." Graham, 490 U.S. at 396. As the Sixth Circuit has stated, the Fourth Amendment "does not require officers to use the best technique available as long as their method is reasonable under the circumstances." Dickerson v. McClellan, 101 F.3d 1151, 1160 (6th Cir. 1996). Thus, the inquiry is an objective one: "whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." Graham, 490 U.S. at 397. In determining whether there has been a violation of the Fourth Amendment, "we consider not the 'extent of the injury inflicted' but whether an officer subjects a detainee to 'gratuitous violence.'" Miller v. Sanilac Cnty., 606 F.3d 240, 252-53 (6th Cir. 2010) (citation omitted).

Ultimately, the Court must decide whether "under the totality of the circumstances, the officer's actions were objectively reasonable." Fox, 489 F.3d at 236-37 (citing Kostrzewa v. City of Troy, 247 F.3d 633, 639 (6th Cir. 2001)). In evaluating the reasonableness of an officer's use of force, the Court must consider "(1) the severity of the crime at issue, (2) whether the suspect posed an immediate threat to the safety of the police officers or others, and (3) whether the suspect resisted

arrest or attempted to evade arrest by fight." Floyd v. City of Detroit, 518 F.3d 398, 407 (6th Cir. 2008) (citing Smoak, 460 F.3d at 783).

The Sixth Circuit recently held that multiple taser applications over a period of "several seconds" can, when coupled with other abuses, amount to excessive force. Landis, 297 F. App'x at 460-61. In Landis, the plaintiff (who was the daughter of a suspect who died in police custody) brought a Section 1983 civil rights action against a Michigan State Trooper and three deputy sheriffs. Id. Like the present case, the plaintiff argued that the government officers used "excessive force" in violation of the Fourth Amendment. Id.

In Landis, police officers arrived at an interstate highway after receiving calls that a bulldozer was blocking traffic lanes. Id. at 455. When the police officers found the suspect (who had allegedly moved the bulldozer), he immediately fled on foot. Id. Eventually, the officers caught up with the suspect, at which point, the suspect choked one of the officers and fled away. Id. at 456. Shortly thereafter, officers found the suspect again. Id. This time the suspect was standing in a pool of water, without a weapon, and unresponsive. Id. The officers hit the suspect with a baton ten times, and tased him a total of five times. Id. In addition, the officers submerged the suspect's face in water for 10-15 seconds. Id. at 456-57.

During this time, the suspect was unarmed and no longer a threat to anyone's safety. Id. In addition, while the suspect had previously fled the scene, he was not suspected of committing a violent offense (again, he was suspected of moving a bulldozer). Id. In considering these facts, the Sixth Circuit held that the officers used "excessive force" in violation of the Fourth Amendment. Id. As one district court has stated, "Landis instructs that, where the troubling use of force was committed against a suspect that was at most guilty of a 'minor and non-violent crime,' and the

suspect was 'surrounded,' 'unarmed,' and 'no longer a threat,' the likelihood that the troubling use of force may be considered a constitutional violation is significantly heightened." <u>Lee v. Metro. Gov't of Nashville & Davidson Cnty.</u>, 596 F. Supp. 2d 1101, 1117 (M.D. Tenn. 2009) (citing <u>Landis</u>, 297 F. App'x at 460-61).

In applying the first factor ("severity of the crime"), <u>Floyd</u>, 518 F.3d at 407, the Court notes that when law enforcement arrived on scene, there was no evidence that Dillingham had committed a violent offense. At most, Dillingham was responsible for driving while intoxicated, or failing to tell the officers where the unknown driver was. Because this is not a violent offense, this factor weighs in Dillingham's favor. This not to downplay the seriousness of drunk driving; it is simply meant to distinguish Dillingham from the types of plaintiffs who commit violent offenses prior to being "seized," and therefore pose a greater threat to officer safety.

As for the second factor, there is mixed evidence regarding whether Dillingham posed an "immediate threat" to law enforcement. Dillingham claims that at the time he was tased, he was already secured on a backboard by medical personnel, and that the taser shot was therefore unnecessary. [Dillingham Dep., Doc. 69-1, at 34, 136:17-138:7]. Dillingham also claims that Deputy McLemore hit him in the face with the flashlight and kicked him in his side, and that Deputy Millsaps tased him in his testicles and stomach–all while being immobilized on a backboard. [Id., at 35, 137:1-144:18]. In contrast, Deputy Millsaps states that he only tasered Dillingham once, and that it was because Dillingham was being combative with the medical personnel. [Deputy Millsaps Dep., Doc. 78-1, at 16, 31:19-32:6]. Deputy Millsaps also denies that he or Deputy McLemore used any additional force on Dillingham. [Id.]. In addition, the Court notes that while Dillingham was involved in a car accident, he only suffered cuts and bruises, and was not severely injured.

26

Dillingham was in a much better condition than Mills, who fractured his right femur. Thus, even though Dillingham was injured in a car accident, he was still capable of posing a threat to law enforcement or medical personnel.

If Dillingham was combative, this would be an important distinction from <u>Landis</u>. In that case, the suspect was not combative with law enforcement when he was beaten and tased. <u>Landis</u>, 297 F. App'x at 460-61. In addition, it unclear how many times Dillingham was tased, or if he was physically beaten. In <u>Landis</u>, the suspect was beaten with a police baton ten times and tased five times over a short amount of time. <u>Id.</u> In the present case, the only fact that both parties agree upon is that Deputy Millsaps tased Dillingham at least once. Obviously, if Dillingham was tased after being immobilized on the backboard, this factor would weigh in his favor. The same would be true if he was beaten with a flashlight, kicked, or hit after being immobilized. However, if Dillingham was combative with medical personnel, and Deputy Millsaps only tased Dillingham once, that fact would weigh in the Defendants' favor. Based upon the conflicting evidence in the record–particularly, the deposition testimony–this factor does not weigh in either party's favor.

As for the third factor, while Dillingham did not resist an "arrest" (he was never actually arrested), he did resist medical attention. While Dillingham claims that he was not being combative, he does admit that the deputy sheriffs told him to stop fighting and cooperate. [Dillingham Dep., Doc. 69-1, at 38, 148:8-149:21]. Again, based upon the mixed evidence in the record, this is a question of credibility. Neither party has provided evidence to support their position, other than their own word.

For purposes of summary judgment, the Court must draw all reasonable inferences in favor of the non-moving party. *See* <u>Wexler v. White's Fine Furniture, Inc.</u>, 317 F.3d 564, 570 (6th Cir.

2003) (in construing a motion for summary judgment, "the court must view the evidence and draw all reasonable inferences in favor of the nonmoving party") (citing <u>Matsushita Elec. Indus.</u>, 475 U.S. at 587). At issue is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." <u>Anderson</u>, 477 U.S. at 251-52. In this case, the evidence–which is mostly testimony–is not "so one-sided that one party must prevail as a matter of law." <u>Id.</u> There are too many important questions, and not enough answers. Was Dillingham combative with the medical personnel or law enforcement? When was Dillingham tased? Was it after he was immobilized, or before? How many times was he tased? If there were multiple applications, did they happen close in time? These are ultimately going to be credibility determinations for the jury–not the Court–to make. *See* <u>Vaughn v. City of Lebanon</u>, 18 F. App'x 252, 266 (6th Cir. 2001) ("The determination of objective reasonableness is particularly fact-based, and, when accounts differ, requires credibility determinations among witnesses to assess the propriety of an officer's actions. Such determinations are matters for the jury, and not the court."). At this time, the Court cannot hold, as a matter of law, in favor of either party. Accordingly, the Court finds that there is a genuine issue of material fact regarding Dillingham's Fourth Amendment "excessive force claim" against Deputy Millsaps and Deputy McLemore in their individual capacities.

> **8    Dillingham's Fourth Amendment Claim Against Sheriff Bivens in His Individual Capacity: Dillingham Has Failed to Raise a Genuine Issue of Material Fact Regarding Whether Sheriff Bivens Encouraged or Authorized the Alleged "Excessive Force" by Deputy Millsaps or Deputy McLemore**

To be clear, the Court did not state that Dillingham prevailed in his Fourth Amendment "excessive force" claims against Deputy Millsaps and Deputy McLemore in their individual

capacities. Rather, the Court simply held that those claims survived the summary judgment stage. The Court only analyzed these claims to determine whether the underlying conduct was unconstitutional. As the Court previously explained, Sherif Bivens cannot be held supervisorily liable for conduct that was constitutional. *See* Part III.A.6. In addition, the Court notes that only Dillingham can bring a Fourth Amendment "excessive force" claim (which is really a "failure to train" claim) against Monroe County and Sheriff Bivens in his individual capacity. Because Mills does not have standing to bring a Fourth Amendment claim against Deputy Millsaps or Deputy McLemore in their individual capacities, he does not have standing to bring a Fourth Amendment claim against Monroe County or Sheriff Bivens in his individual capacity. In addition, because the Court dismissed Mills's substantive due process claim (based upon "excessive force") under the Fourteenth Amendment against Deputy Millsaps in his individual capacity, *see* Part III.A.5, the Court also dismissed his "excessive force" claims against Monroe County and Sheriff Bivens in his individual capacity, also brought under the substantive due process clause of the Fourteenth Amendment, id. Consequently, only Dillingham may assert "excessive force" claims against Monroe County or Sheriff Bivens in his individual capacity. This is because Dillingham's underlying "excessive force" claim survived summary judgment.

Supervisory liability cannot be imposed in a Section 1983 action based on the theory of *respondeat superior* without proof of personal involvement. Taylor v. Mich. Dep't of Corr., 69 F.3d 76, 80-81 (6th Cir. 1995). Notably, "[s]upervisory liability under § 1983 does not attach when it is premised on a mere failure to act; it 'must be based on active unconstitutional behavior.'" Greene v. Barber, 310 F.3d 889, 899 (6th Cir. 2002) (quoting Leach, 891 F.2d at 1246). As the Sixth Circuit has stated, "[a] supervisor is not liable under § 1983 for failing to train unless the supervisor 'either

encouraged the specific incident or misconduct or in some other way directly participated in it.  At a minimum a plaintiff must show that the official at least implicitly **authorized, approved, or knowingly acquiesced in the unconstitutional conduct** of the offending officers.'"  Everson v. Leis, 556 F.3d 484, 495 (6th Cir. 2009) (emphasis added) (quoting Hays v. Jefferson Cnty., 668 F.2d 869, 874 (6th Cir. 1982)).  The central question, therefore, is whether Sheriff Bivens "implicitly authorized, approved, or knowingly acquiesced" in Deputy Millsaps's and Deputy McLemore's alleged use of "excessive force."  For purposes of this analysis, the Court will assume–without deciding–that Deputy Millsaps and Deputy McLemore engaged in unconstitutional conduct.

In support of their "supervisory" liability claim, Plaintiffs allege that Sheriff Bivens implicitly authorized the alleged misconduct by failing to properly train Deputy Millsaps and Deputy McLemore regarding the appropriate use of force.  To prevail on a "supervisory" liability claim, however, Plaintiffs must point to some specific act by Sheriff Bivens.  A general "failure to train" claim has been routinely rejected by the Sixth Circuit in this context (trying to impose liability on a supervisor in his or her individual capacity).  In Ontha v. Rutherford Cnty., the Sixth Circuit addressed a Fourth Amendment "excessive force" claim against the Sheriff of Rutherford County in his individual capacity.  222 F. App'x 498, 503-05 (6th Cir. 2007).  In Ontha, the plaintiffs attempted to hold the sheriff liable for the alleged misconduct of his deputy sheriffs.  Id. Specifically, the plaintiffs alleged that the sheriff failed to train the deputy sheriffs in the use of appropriate force, and therefore "authorized" their alleged misconduct.  Id.  The Sixth Circuit rejected this argument, finding that the plaintiffs failed to highlight specific, affirmative acts by the sheriff:

> To extent that Plaintiffs even assert that this standard of supervisory
> liability can be met here, they evidently contend that Sheriff Jones

implicitly authorized the alleged misconduct of Deputies Emslie and Morrow by failing to properly train these deputies regarding the appropriate use of force and, more particularly, the inappropriateness of using a patrol car to strike or seize an individual. As Plaintiffs point out, Sheriff Jones acknowledged in his affidavit that the Rutherford County Sheriff's Office 'does not have a written policy specifically prohibiting' the use of a patrol car to strike a person who is fleeing on foot [which was the basis for the alleged excessive force claim in that case]. Plaintiffs posit that this lack of training served as implicit authorization of or knowing acquiescence in Deputy Emslie's allegedly inappropriate use of his patrol car to chase and strike Tommy Ontha as he attempted to flee.

Yet, to establish supervisory liability, it is not enough to point after the fact to a particular sort of training which, if provided, might have prevented the harm suffered in a given case. Rather, such liability attaches only if a constitutional violation is 'part of a pattern' of misconduct, or 'where there is essentially a complete failure to train the police force, or training that is so reckless or grossly negligent that future police misconduct is almost inevitable or would properly be characterized as substantially certain to occur. Only in such circumstances can it be said that a supervisor's liability rests upon 'active unconstitutional behavior,' as opposed to 'a mere failure to act.'

In this case, Plaintiffs do not contend that Deputy Emslie's purported misuse of his patrol car was part of a pattern of comparable violations, as opposed to an isolated occurrence. Neither have Plaintiffs suggested any basis for us to conclude that the tragic events of this case were an 'almost inevitable' or 'substantially certain' byproduct of a lack of training as to the proper operation of a patrol car when pursuing an individual traveling on foot. Rather, Sheriff Jones states without contradiction that 'we have never had an instance where a Rutherford County Sheriff's deputy intentionally struck a person with his or her patrol car,' and that he is 'not aware of a problem or trend in the law enforcement community regarding law enforcement officers using their vehicles to intentionally strike fleeing suspects or other persons on foot.' Under this record, we find as a matter of law that Plaintiffs cannot sustain their § 1983 claims against Sheriff Jones in his individual capacity.

Id. at 504-05 (citations and quotations omitted). In sum, the Sixth Circuit in Ontha rejected the

general "failure to train" claim as a basis for imposing supervisory liability on the sheriff. Id. This

generalized "failure to train" claim was not enough to constitute "active constitutional behavior." Id.

In the present case, Plaintiffs argue that Sheriff Bivens should be held supervisorily liable because Deputy Millsaps did not receive a copy of the Policy Manual. [Plaintiffs' Response in Opposition to Motion for Summary Judgment, Doc. 75, at 3-4]. Plaintiffs then state–ignoring the different constitutional standards for individual liability and municipal liability–that "courts have held that the absence of a policy can be sufficient to establish **municipal liability**." [Id., at 4] [emphasis added]. The claim brought against Sheriff Bivens–a general "failure to train" claim–is exactly what the Sixth Circuit warned against in Ontha, 222 F. App'x at 504-05. Plaintiffs have incorrectly conflated the constitutional standards for individual supervisory liability and municipal liability. *See* Harvey v. Campbell Cnty., No. 09-5041, 2011 WL 1789955, at *6 (6th Cir. May 10, 2011) (recognizing that "absent evidence of personal involvement in the underlying misconduct, failure-to-train claims against individual defendants are not properly deemed brought against them in their official capacities, to be treated as claims against the county") (citing Miller v. Calhoun Cnty., 408 F.3d 803, 817 n.3 (6th Cir. 2005)). Absent personal involvement in the underlying unconstitutional act, the attempt to hold "[municipal supervisors] liable in their individual capacities for their alleged failure to adequately train employees . . . 'improperly conflates a § 1983 claim of individual supervisory liability with one of municipal liability.'" Harvey, 2011 WL 1789955, at *6 (quoting Phillips, 534 F.3d at 543-44). In this case, there is no evidence that Sheriff Bivens was personally involved or authorized the alleged incident. Consequently, Plaintiffs have improperly brought suit against Sheriff Bivens in his individual capacity.

Generally, there are two ways of imposing supervisory liability: (1) a pattern of conduct; or (2) a truly egregious single incident. <u>Ontha</u>, 222 F. App'x at 504-05. Because Plaintiffs have failed to establish a pattern of similar incidents, Sheriff Bivens will only be liable if there was "essentially a complete failure to train the police force, or training that is so reckless or grossly negligent that future police misconduct is almost inevitable or would properly be characterized as substantially certain to occur." <u>Id.</u> Even assuming that Deputy Millsaps never received a copy of the Policy Manual, he still received training on the appropriate use of force. [Deputy Millsaps's Dep., Doc. 78-1, at 4, 6:2-5, at 6, 11:4-6]. Deputy Millsaps graduated from the Tennessee Law Enforcement Training Academy in 1996 where he received training on the use of force. [<u>Id.</u>]. At the time of the alleged incident, Deputy Millsaps was in good standing with the Sheriff's Department and had not received any complaints. [Sheriff Bivens Affidavit, Doc 68, at 3, ¶ 5]. Deputy Millsaps was also up to date on his annually-required forty hours of continuing education. [Sheriff Bivens Affidavit, Doc 68, at 3, ¶ 5]. Additionally, Deputy Millsaps received training at the Academy on how to deal with belligerent individuals, and this training was refreshed every couple of years. [Deputy Millsaps Dep., Doc. 78-1, at 8, 13:5-16].

In addition to the more general training, Deputy Millsaps also attended a taser training class in the fall of 2006 that lasted four to eight hours. [<u>Id.</u> at 6, 11:10-18]. During this class, he was instructed on the appropriate use of force, both generally and specifically with regard to using tasers. [<u>Id.</u> at 6, 11:7-12]. For example, Deputy Millsaps was taught that using a taser is appropriate when a person does not respond to verbal commands and is being combative. [<u>Id.</u> at 8, 13:17-14:12]. The fact that Dillingham completed this training is significant. Plaintiffs are trying to equate "failure to give a policy manual" with "failure to train," and completely ignoring the fact that Deputy Millsaps

received training on the precise weapon at issue in this case. This training–which was tailored to the appropriate use of taser guns–is a lot more specific than the Policy Manual's general statement that officers should use "reasonable force."

With regard to Deputy McLemore, there is nothing in the record that suggests he did or did not receive taser training. This fact, however, is not important. Dillingham's "failure to train" claim against Sheriff Bivens in his individual capacity does not involve Deputy McLemore; it is premised upon the fact that Deputy Millsaps did not receive a copy of the Policy Manual. Consequently, Deputy McLemore's training–or lack of training–is not relevant to this claim.

Viewing the facts in the light most favorable to the non-moving party, there is simply no evidence that Sheriff Bivens encouraged or authorized the alleged actions of Deputy Millsaps and Deputy McLemore. This general "failure to train" claim should have been directed against Monroe County, not Sheriff Bivens in his individual capacity. *See, e.g.*, Phillips, 534 F.3d at 544 ("The Estate's general allegations that the correctional officers and paramedics were not properly trained are more appropriately submitted as evidence to support a failure-to-train theory against the municipality itself, and not the supervisors in their invidividual capacities.") (citing City of Canton v. Harris, 489 U.S. 378, 385 (1989)). Moreover, even when considering this claim, Plaintiffs have failed to cite any specific, affirmative act by Sheriff Bivens that would subject him to liability. Accordingly, Dillingham's Fourth Amendment "excessive force" against Sheriff Bivens in his individual capacity is **DISMISSED WITH PREJUDICE**. Furthermore, because Sheriff Bivens cannot be held supervisorily liable, there is no need to determine whether Sheriff Bivens is entitled to qualified immunity. *See* Marvin v. City of Taylor, 509 F.3d 234, 244 (6th Cir. 2007) ("If there is

34

no constitutional violation, then the plaintiff's § 1983 claim fails as a matter of law and the defendant is therefore entitled to summary judgment and does not need qualified immunity.").

> ### 9. Dillingham's Fourth Amendment Claim Against Monroe County: Dillingham Has Failed to Material Raise a Genuine Issue of Material Fact Regarding Whether the Monroe County Sheriff's Department Had a Policy or Custom Encouraging or Authorizing Inadequate Training on the Use of Force, and Specifically on Using Tasers

It is well established that Section 1983 claims against a municipality cannot be based on a *respondeat superior* theory of liability. Monell, 436 U.S. at 690-91. Instead, a plaintiff must show that the county "maintained a policy or custom that caused the violation." Harvey, 2011 WL 1789955, at *5. Because the Monroe County Sheriff's Department does not have an express policy encouraging the use of unreasonable force, the Court must determine whether it has a custom of doing so. Specifically, the Court must determine whether there is a genuine issue of material fact regarding whether the Monroe County Sheriff's Department has a custom of providing inadequate training or supervision of its deputy sheriffs. *See* Ellis ex rel. Pendergrass v. Cleveland Mun. Sch. Dist., 455 F.3d 690, 700 (6th Cir. 2006) ("One way to prove an unlawful policy or custom is to show a policy of inadequate training or supervision.") (citation omitted); Sova v. City of Mt. Pleasant, 142 F.3d 898, 904 (6th Cir. 1998) ("When the damage was inflicted by municipal employees, such as police officers, the city can be held liable for failing to train its employees adequately. Yet in this situation, a plaintiff can establish liability '[o]nly where a municipality's failure to train its employees in a relevant respect evidences a 'deliberate indifference' to the rights of its inhabitants.'") (quoting Canton, 489 U.S. at 389).

Monroe County may only be held liable if Dillingham can prove that there was a failure to adequately train Deputies Millsaps or McLemore, and that such failure amounted to "deliberate

35

indifference." In <u>City of Canton v. Harris</u>, the Supreme Court established the framework for analyzing "failure to train" claims brought against municipalities:

> [T]he inadequacy of police training may serve as the basis for Section 1983 liability only where the failure to train amounts to deliberate indifference to the rights of persons with whom the police came into contact. This rule is most consistent with our admonition . . . that a municipality can be liable under Section 1983 only where its policies are the 'moving force [behind] the constitutional violation.' Only where a municipality's failure to train its employees in a relevant respect evidences a 'deliberate indifference' to the rights of its inhabitants can such a shortcoming be properly thought of as a city 'policy or custom' that is actionable under Section 1983.

489 U.S. at 388-89 (internal citations omitted). In order to succeed on a "failure to train" theory, the plaintiff must show (1) that the training was inadequate for the tasks performed; (2) the inadequacy was the result of the municipality's deliberate indifference; and (3) the inadequacy was closely related to or actually caused the injury at issue. <u>Ellis</u>, 455 F.3d at 700. In <u>Ellis</u>, the Sixth Circuit identified two instances in which a finding of deliberate indifference would be appropriate: "(1) where the training lapse occurs despite 'foreseeable consequences' that will flow from the lapse; and (2) where the training lapse occurs despite 'repeated complaints' to the municipality about the issues that should have been dealt with in training." <u>Lee</u>, 596 F. Supp. 2d at 1124 (citing <u>Ellis</u>, 455 F.3d at 700-01). Under the <u>Ellis</u> standard, "the plaintiff must first show whether taser-certified officers . . . received adequate training on how to operate their tasers, specifically instruction that it could be dangerous to apply multiple shocks to a suspect over a short period of time." <u>Lee</u>, 596 F. Supp. 2d at 1124. In this case, there is no evidence of "repeated complaints" about the use of tasers (or force more generally) by law enforcement officers in the Monroe County Sheriff's Department. Consequently, Dillingham must proceed under a "single incident" theory.

The Supreme Court recently affirmed that "deliberative indifference" is "a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action." Connick v. Thompson, 131 S.Ct. 1350, 1360 (2011) (citation and alteration omitted). Like his claim against Sheriff Bivens in his individual capacity, *see* Part III.A.8, Dillingham relies entirely upon one fact: that Deputy Millsaps did not receive a copy of the Policy Manual. This, however, is not a significant fact. In reviewing Dillingham's "failure to train" claim, the focus should be on whether Deputy Millsaps[17] received adequate training on how to use a taser. As the Supreme Court explained in Canton:

> In resolving the issue of a city's liability, **the focus must be on adequacy of the training program in relation to the tasks the particular officers must perform**. That a particular officer may be unsatisfactorily trained will not alone suffice to fasten liability on the city, for the officer's shortcomings may have resulted from factors other than a faulty training program. It may be, for example, that an otherwise sound program has occasionally been negligently administered. Neither will it suffice to prove that an injury or accident could have been avoided if an officer had better or more training, sufficient to equip him to avoid the particular injury-causing conduct. Such a claim could be made about almost any encounter resulting in injury, yet not condemn the adequacy of the program to enable officers to respond properly to the usual and recurring situations with which they must deal. And plainly, adequately trained officers occasionally make mistakes; the fact that they do says little about the training program or the legal basis for holding the city liable.

> To adopt lesser standards of fault and causation would open municipalities to unprecedented liability under § 1983. In virtually every instance where a person has had his or her constitutional rights violated by a city employee, a § 1983 plaintiff will be able to point to something the city could have done to prevent the unfortunate

---

[17] As the Court previously stated, there is nothing in the record that suggests Deputy McLemore did or did not receive adequate training on how to use a taser. However, Dillingham's Fourth Amendment "excessive force" claim against Monroe County only involves Deputy Millsaps. Dillingham's claim is premised solely upon the fact that Deputy Millsaps did not receive a copy of the Policy Manual. Consequently, Deputy McLemore's training–or lack of training–is not relevant to this claim.

> incident. Thus, permitting cases against cities for their failure to train
> employees to go forward under § 1983 on a lesser standard of fault
> would result in de facto respondeat superior liability on
> municipalities–a result we rejected in <u>Monell</u>, 436 U.S. at 693-94. It
> would also engage the federal courts in an endless exercise of
> second-guessing municipal employee-training programs. . . .

489 U.S. at 390-91 (citations omitted).

As the Supreme Court has instructed, the focus should be on the training program "in relation to the tasks the particular officers must perform." <u>Id.</u> at 390. In other words, did Deputy Millsaps receive adequate training on how to use tasers, and the use of force more generally? Having reviewed the record, there is absolutely nothing that suggests otherwise. Even assuming that Deputy Millsaps never received a copy of the Policy Manual, he still received training on the appropriate use of force. [Deputy Millsaps's Dep., Doc. 78-1, at 4, 6:2-5, at 6, 11:4-6]. Deputy Millsaps graduated from the Tennessee Law Enforcement Training Academy in 1996 where he received training on the use of force. [<u>Id.</u>]. At the time of the alleged incident, Deputy Millsaps was in good standing with the Sheriff's Department and had not received any complaints. [Sheriff Bivens Affidavit, Doc 68, at 3, ¶ 5]. In addition to the more general training, Deputy Millsaps also attended a taser training class in the fall of 2006 that lasted four to eight hours. [Deputy Millsaps Dep., Doc. 78-1, at 6, 11:10-18]. During this class, the participants were instructed on the appropriate use of force, both generally and specifically with regard to using tasers. [<u>Id.</u> at 6, 11:7-12]. Plaintiffs have done nothing to refute any of this. Certainly, Deputy Millsaps's training was a lot more specific than the Policy Manual's general statement that officers should only use "reasonable force":

> **<u>Use of Force to Arrest a Person</u>**: A Deputy Sheriff may, by law, use
> all necessary and reasonable force, including entry into any building
> or property, or order to make an authorized arrest.

38

[Plaintiffs' Response in Opposition to Defendants' Motion for Summary Judgment, Doc. 75, at 3]. This is nothing more than a general statement that officers should only use "reasonable force." This is a fundamental and basic rule–one that any law enforcement officer should know. This is a general mandate, rather than specific training like the taser program. The fact that Deputy Millsaps received training on the precise weapon at issue in this case certainly suggests that he would understand the Policy Manual. After all, the purpose of the training was to instruct him on the use of force, as it *relates* to a taser gun.

In addition, it is significant that there is no evidence of past complaints against Deputy Millsaps, or other deputy sheriffs. The record does not contain any past allegations, complaints, or suits regarding force or misconduct by Monroe County deputy sheriffs prior to May 11, 2007 (the date of the car accident). While a history of past conduct is not necessary to establish municipal liability, courts are more inclined to find a "custom" when there has been a history of complaints or similar behavior. *See* Connick, 131 S.Ct. At 1360 (recognizing that proof of "[a] pattern of similar constitutional violations by untrained employees is 'ordinarily necessary' to demonstrate deliberate indifference for purposes of failure to train") (citing Bd. of Cnty. Comm'rs of Bryan Cnty. v. Brown, 520 U.S. 397, 409 (1997)). Given the lack of evidence in the record supporting Dillingham's claims, and the fact that federal courts should generally refrain from "second-guessing municipal employee-training programs," Canton, 489 U.S. at 391-92, Dillingham's Fourth Amendment claims against Monroe County are **DISMISSED WITH PREJUDICE**.

**B.     Plaintiffs' State Law Claims against Monroe County and Sheriff Bivens**

**1.     Plaintiffs' State Law Claims Against Monroe County are Dismissed**

Sheriff Bivens and Monroe County have also moved to dismiss all state law claims against them. [Defendants' Memorandum in Support of their Motion for Summary Judgment, Doc. 69, at 17-18]. As an initial matter, the Court notes that district courts in the Sixth Circuit are split over whether to decline to exercise supplemental jurisdiction, 28 U.S.C. § 1367, over pendant state law claims brought under the Tennessee Governmental Tort Liability Act ("TGTLA"), T.C.A. § 29-20-101 *et seq*. Some district courts have declined to exercise supplemental jurisdiction over claims brought under the TGTLA. *See* Heyne v. Metro. Nashville Pub. Schs., 626 F. Supp. 2d 724, 734-35 (M.D. Tenn. 2008); Lee v. Metro. Gov't of Nashville & Davidson Cnty., No. 3:06-0108, 2008 WL 501327, at *5 (M.D. Tenn. Feb. 21, 2008) (citation omitted); Payne v. Tipton Cnty., No. 05-2310, 2006 WL 1967046, at *2 (W.D. Tenn. Jul. 12, 2006). Other courts have decided to exercise supplemental jurisdiction over claims brought under the TGTLA. *See* Harris v. McCormack, No. 3:08-cv-00699, 2011 WL 253163, at *4 (M.D. Tenn. Jan. 26, 2011); Lopez v. Metro. Gov't of Nashville & Davidson Cnty., 646 F. Supp. 2d 891, 920-21 (M.D. Tenn. 2009); Birgs v. City of Memphis, 686 F. Supp. 2d 776, 778-79 (W.D. Tenn. 2010); Brown v. City of Memphis, 440 F. Supp. 2d 868, 878 (W.D. Tenn. 2006); Johnson v. Gannon, No. 3:09-0551, 2010 WL 1658616, at *7 (M.D. Tenn. Apr. 23, 2010). Even if Tennessee courts have original jurisdiction to review claims brought under the TGTLA, that does not defeat federal jurisdiction. *See* Brown, 440 F. Supp. 2d at 878 (recognizing that "[s]upplemental jurisdiction is grounded implicitly in Article III of the Constitution, and, explicitly, in federal statutory law," that state legislatures "are powerless to impose jurisdictional constraints upon the federal judiciary," and therefore "[w]hatever the intent of the Tennessee legislature may have been in enacting the [TGTLA], the authority of the federal courts to appropriately exercise jurisdiction over supplemental state law matters remains

40

undiminished") Under these circumstances, the Court finds that declining to exercise supplemental jurisdiction would "necessitate duplicative litigation which would be wasteful of judicial and litigant resources). Id. Notably, Plaintiffs' state law claims and federal claims derive from the same "common nucleus of operative fact," and therefore should be reviewed in one proceeding. United Mine Workers of Am. v. Gibbs, 383 U.S. 715, 725 (1966). Accordingly, the Court will review Plaintiffs' state law claims against Monroe County.

In their Amended Complaint [Doc. 42], Plaintiffs allege that "the misconduct of defendants Millsaps and McLemore in investigating the motor vehicle accident and interrogating the Plaintiffs amounts to negligence for which defendants Bivens and Monroe County are liable pursuant to the [TGTLA]." [Plaintiffs' Amended Complaint, Doc. 42, at 6, ¶ 32]. Plaintiffs also allege that "the failure to train, the inappropriate customs, policies and procedures, and/or the failure to initiate appropriate policies and procedures for the use of force constitutes negligence for which defendants Bivens and Monroe County are liable pursuant to the [TGTLA]." [Id., at 6, ¶ 36].

Since 1973, the TGTLA has governed claims against counties, municipalities, and other local governmental agencies. Doyle v. Frost, 49 S.W.3d 853, 857 (Tenn. 2001) (citation omitted). Under the TGTLA, Monroe County "is generally subject to suit for civil claims sounding in negligence with certain enumerated exceptions." Campbell v. Anderson Cnty., 695 F. Supp. 2d 764, 777 (E.D. Tenn. 2010) (citations omitted). While the TGTLA removes immunity for an "injury proximately caused by a negligent act or omission of any employee within the scope of his employment," it also provides a list of exceptions (which prevents the municipality from being sued). See Johnson v. City of Memphis, 617 F.3d 864, 872 (6th Cir. 2010) (citing T.C.A. § 29-20-205). As the Sixth Circuit has explained, "injuries that 'arise[] out of . . . civil rights' are one such exception, that is, sovereign

41

immunity continues to apply in those circumstances." <u>Johnson</u>, 617 F.3d at 872 (citing T.C.A. § 29-20-205). Notably, the TGTLA's "civil rights" exception has been construed to include claims arising under 42 U.S.C. § 1983. <u>Johnson</u>, 617 F.3d at 872 (citation omitted).

### a.  Negligence

First, the Court will address Plaintiffs' "negligence" claim against Monroe County. Even though Plaintiffs allege that Monroe County was negligent in its "failure to train," [Plaintiffs' Amended Complaint, Doc. 42, at 6, ¶ 32], they are in essence bringing a civil rights claim. The "civil rights" exception was discussed at length in <u>Campbell</u>, 695 F. Supp. 2d at 778. In <u>Campbell</u>, a woman filed suit against a county under both 42 U.S.C. § 1983 and the TGTLA. <u>Id.</u> at 769. She argued that the county was negligent in its supervision and training of deputy sheriffs who allegedly falsely imprisoned and sexually assaulted her. <u>Id.</u> at 769. After reviewing the plaintiff's negligence claim, the court found that it was based upon the same conduct giving rise to her Section 1983 claim. <u>Id.</u> at 778. Consequently, even though the plaintiff labeled her claim as "negligence," the court held that her claims fell within the "civil rights" exception under the TGTLA:

> Campbell's tort claims of false imprisonment, assault and battery, intentional infliction of emotional distress, and negligence brought against the County under Tennessee law are predicated on the allged violation of her civil rights by Graham. The contention that former Reserve Deputy Graham committed false imprisonment, assault and battery, and intentional infliction of emotional distress **clearly arise out of and directly flow from the allegations that he deprived Campbell of her civil rights by sexually assaulting her**. Because Campbell asserts her claims against the County, in the context of a civil rights case, her alleged injuries arise out of 'civil rights' and the County is entitled to immunity from suit on these claims pursuant to the 'civil rights' exception in Tenn. Code Ann. § 29-20-205(2).
>
> Although Campbell may seek to circumvent or avoid the County's immunity from suit under § 29-20-205(2) by **couching some of her civil rights claims against the County in the guise of negligence**,

42

this strategy fails. The underlying acts which Campbell alleges to be negligent are by their very nature the type of conduct one usually associates with intentional torts (false imprisonment, assault and battery, intentional infliction of emotional distress). Campbell's negligence claim is predicated on intentional tortious conduct involving the violation of her civil rights by employees of the County. Based on the facts and circumstances of this case, the court sees no reason why the County should not have immunity from suit under the 'civil rights' exception in Tenn. Code Ann. § 29-20-205(2).

Campbell, 695 F. Supp. 2d at 778 (emphasis added). Likewise, in the present case, Plaintiffs' negligence claim against Monroe County is nothing more than civil rights claim: it is still based upon an underlying claim of "excessive force." As a basis for their negligence claim, Plaintiffs allege that Monroe County was negligent in its "failure to train"– that is, the Sheriff's Department did not provide adequate training on using tasers, and the use of force more generally. This is identical to Dillingham's "failure to train" claims brought under 42 U.S.C. § 1983. Because the claims arise out of the same facts–and are based upon the same arguments–Plaintiffs' negligence claims against Monroe County are barred under the "civil rights" exception of the TGTLA, T.C.A. § 29-20-205(2). See Johnson, 617 F.3d at 872 ("Plaintiff's claim regarding the dispatcher's negligence arises out of the same circumstances giving rise to her civil rights claim under § 1983. It therefore falls within the exception listed in § 29-20-205, and the City retains its immunity."); Campbell, 695 F. Supp.2d at 778 ("These torts are alleged to have been committed solely in the context of the violation of [plaintiff's] civil rights–this is in essence a civil rights suit."); Jackson v. Thomas, No. M2010-01242-COA-R3CV, 2011 WL 1049804, at *7 (Tenn. Ct. App. Mar. 23, 2011) (dismissing a claim for negligence against the county under the "civil rights" exception) ("In her complaint, Ms. Jackson asserts that her rights under the Fourth Amendment of the United States Constitution were violated as a result of the erroneous issuance of the arrest warrant. Thus, her

43

claims against Jackson County arise out of the assertion that her civil rights were violated. Because Ms. Jackson's injuries arise out of claims that her civil rights were violated, the civil rights exception in Tenn. Code Ann. § 29-20-205(2) applies. Therefore, the County retains immunity from such claims and dismissal of these claims was proper."); <u>Shelton v. Rutherford Cnty.</u>, No. 3:09-cv-0318, 2009 WL 2929394, at *12 (M.D. Tenn. Sep. 8, 2009) (where "negligence claims are asserted in the context of a civil rights case and are based upon the same actions that gave rise to the civil rights claims . . . the cause of action falls within . . . [the] immunity granted under Tenn. Code. Ann. § 39-20-205"); <u>Butler v. City of Englewood</u>, No. 1:07-cv-184, 2008 WL 4006786, at * 13 (E.D. Tenn. Aug. 25, 2008) (holding that where the plaintiff's state law claims "clearly arise out of and directly flow from the allegations that the police officer deprived [plaintiff] of [her] civil rights," the municipality was entitled to immunity under the TGTLA). Accordingly, Plaintiffs' negligence claims against Monroe County are **DISMISSED WITH PREJUDICE**, as they fall under TGTLA's "civil rights" exception, T.C.A. § 29-20-205(2).

### b. Intentional Infliction of Emotional Distress

Second, to the extent that Plaintiffs have asserted intentional tort claims against Monroe County–based upon the conduct of Deputy Millsaps and Deputy McLemore–those claims are also dismissed. In addition to their negligence claims, Plaintiffs have brought claims of "intentional infliction of emotional distress" [Plaintiffs' Amended Complaint, Doc. 42, at 6, ¶ 31], and assault and battery [<u>Id.</u>, at 6, ¶ 30]. Section 29-20-205 of the TGTLA provides, in pertinent part, that immunity from suit of all governmental entities is removed "for injury proximately caused by a negligent act or omission of any employee within the scope of his employment, except if the injury arises out of . . . (2) false imprisonment to a mittimus from a court, false arrest, malicious

44

prosecution, intentional trespass, abuse of process, libel, slander, deceit, interference with contract rights, **infliction of mental anguish**, invasion of right of privacy, or civil rights." T.C.A. § 29-20-205(2) (emphasis added). To the extent that Plaintiffs have sued Monroe County for intentional infliction of emotional distress, that claim is expressly bared[18] by the TGTLA, T.C.A. § 29-20-205(2). Consequently, Plaintiffs' intentional infliction of emotional distress claims against Monroe County are **DISMISSED WITH PREJUDICE.**

### C.     Assault and Battery

While "intentional infliction of emotional distress" is specifically enumerated as an exception under the TGTLA, "assault and battery" is not. *See* Limbaugh v. Coffee Med. Ctr., 59 S.W.3d 73, 79 (Tenn. 2001) (recognizing that the TGTLA only preserves a municipality's immunity for those intentional torts specifically listed in T.C.A. § 29-20-205(2)). To the extent that Plaintiffs have sued Monroe County for assault and battery, Monroe County may only be held liable "if it is established that the injuries inflicted on the plaintiff were 'proximately caused by a negligent act or omission' of supervisory personnel due to the failure to take reasonable precautions from the forseeable risk." Jones v. Bedford Cnty., No. M2009-01108-COA-R3-CV, 2009 WL 4841063, at *3 (Tenn. Ct. App. Dec. 15, 2009) (quoting Limbaugh, 59 S.W.3d at 79). In order for the County to be liable for assault or battery, "it must be established that the County should have reasonably foreseen or anticipated that the plaintiff would be at risk of the injuries complained about." Jones, 2007 WL 3202760, at *3 (citations omitted).

---

[18]  While the TGTLA refers to the tort of "infliction of mental anguish," the Tennessee Supreme Court has recognized that such phrase refers to the "intentional infliction of emotional distress." Sallee v. Barrett, 171 S.W. 3d 822 , 831 (Tenn. 2005). In their Amended Complaint [Doc. 42], Plaintiffs brought claims of "intentional infliction of emotional distress," [id. at 6, ¶ 31]. Plaintiffs' claim against Monroe County is therefore barred by the TGTLA, T.C.A. § 29-20-205(2).

In this case, there is no evidence that Monroe County supervisors–such as Sheriff Bivens–committed an independent act or omission of negligence that proximately caused the alleged injuries. First, there is no evidence of complaints that deputy sheriffs misused tasers, or somehow engaged in unlawful conduct. There is simply no pattern or history in this case. Second, the evidence shows that Deputy Millsaps received general training on the use of force, and specific training on how to use a taser. This combination clearly demonstrates that it was not reasonably foreseeable that Plaintiffs "would be at risk of the injuries complained about." Jones, 2007 WL 3202760, at *3. Accordingly, to the extent that Plaintiffs have brought claims of assault and battery against Monroe County, those claims are **DISMISSED WITH PREJUDICE**.

Finally, the Court notes that Plaintiffs' intentional tort claims could be dismissed for another reason. Like their negligence claim, their intentional tort claims fall under the "civil rights" exception of the TGTLA, T.C.A. § 29-20-205(2), because they arise from the same circumstances as their civil rights claims under 42 U.S.C. § 1983. See Campbell, 695 F. Supp. 2d at 778.

### 2. Plaintiffs' State Law Claims Against Sheriff Bivens in His Individual Capacity are Dismissed

#### a. Assault

To the extent that Sheriff Bivens relies upon the TGTLA as a defense, that reliance is wholly misplaced. [Defendants' Memorandum of Law in Support of their Motion for Summary Judgment, Doc. 69, at 17-18]. The TGTLA does not grant immunity to *individuals* for intentional acts. *See* Griffin v. Hardrick, 604 F.3d 949, 956 (6th Cir. 2010) (in evaluating a plaintiff's state-law battery claim against a public employee, the court recognized that "[the plaintiff] brought this claim under the [TGTLA], which permits individuals to bring a cause of action against governmental employees who allegedly commit intentional torts") (citing Baines v. Wilson Cnty., 86 S.W.3d 575, 583

46

n.5(Tenn. Ct. App. 2002) ("We are aware that the [T]GTLA, specifically Tenn. Code Ann. § 29-20-310, states that if a governmental entity is immune, the employee can be liable. However, for an employee to be liable, a cause of action must exist against the employee in his or her individual capacity. It is still necessary that all the elements of the tort are alleged by the plaintiff."); Reagan v. City of Knoxville, No. 3:07-CV-189, 2008 WL 305018, at *5-7 (E.D. Tenn. Jan. 31, 2008) (recognizing that the TGTLA definition of a governmental entity does not include its "employees," and therefore the TGTLA does not provide immunity to public employees).

In Tennessee, assault is defined as "any act tending to do corporal injury to another, accompanied with such circumstances as denote at the time an intention, coupled with the present ability, of using actual violence against the person." Thompson v. Williamson Cnty., 965 F.Supp. 1026, 1037 (M.D. Tenn.1997). A defendant is not liable for assault unless he or she commits an "intentional act creating a reasonable apprehension of imminent physical harm on the part of the plaintiff." Baker v. Moreland, 1989 WL 89758, at *5 (Tenn. Ct. App. Aug. 9, 1989).

A civil action for assault cannot be sustained upon the basis of words alone. Id. Rather, there must be an overt act or physical movement causing the plaintiff to believe he was in imminent physical harm or danger. Id. "An overt act is an essential element of an assault, and mere preparation or a threat to commit an assault unaccompanied by physical effort to do so, does not amount to an assault." Id. In other words, the defendant must make a physical movement "which might be reasonably interpreted as the beginning of a physical attack upon the plaintiff." Id., at *6.

Notably, Sheriff Bivens was not present during the alleged incident. Consequently, there is no way that he could create "a reasonable apprehension of imminent physical harm" to the Plaintiffs. There are simply no facts in the record that would allow Plaintiffs to survive summary judgment on

47

this claim. Accordingly, Plaintiffs' assault claims against Sheriff Bivens in his individual capacity are **DISMISSED WITH PREJUDICE.**

### b.   Battery

In Tennessee, battery is defined as "any intentional, unlawful and harmful (or offensive) contact by one person with the person of another." <u>Raines v. Shoney's, Inc.</u>, 909 F.Supp. 1070, 1083 (E.D. Tenn. 1995). However, "not every physical contact that is unconsented to is so offensive that it amounts to a battery." <u>Runions v. Tenn. State Univ.</u>, No. M2008-01574-COA-R3-CV, 2009 WL 1939816, at *4 (Tenn. Ct. App. Jul. 6, 2009). Rather, "offensive contact" is "contact that infringes on a reasonable sense of personal dignity ordinarily respected in a civil society." <u>Doe v. Mama Taori's Premium Pizza</u>, No. M1998-00992-COA-R9-CV, 2001 WL 327906, at *4 (Tenn. Ct. App. Jan. 21, 2001). Thus, the Court must determine if there is a genuine issue of material fact regarding whether Sheriff Bivens made physical contact that infringed upon a "reasonable sense of personal dignity." <u>Id.</u>

Once again, Sheriff Bivens was not present during the alleged incident. Consequently, it was impossible for him to make an "offensive contact" with the Plaintiffs. Accordingly, Plaintiffs' battery claims against Sherif Bivens in his individual capacity are **DISMISSED WITH PREJUDICE.**

### c.   Intentional Infliction of Emotional Distress

In order to establish a claim for intentional infliction of emotional distress ("IIED"), the plaintiff must show that a defendant's conduct was "(1) intentional or reckless; (2) so outrageous that it cannot be tolerated in a civilized society; and (3) the cause of serious mental injury to the

plaintiff."  Bain v. Wells, 936 S.W.2d 618, 633 (Tenn. 1997).  In determining whether conduct is "outrageous," courts are instructed to follow the Restatement (Second) of Torts:

> It has not been enough that the defendant has acted with an intent which is tortious or even criminal, or that he has intended to inflict emotional distress, or even that his conduct has been characterized by 'malice,' or a degree of aggravation which would entitle the plaintiff to punitive damages for another tort.  Liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized community.

Restatement (Second) of Torts, Section 46, Comment D.  Under this high standard, "mere insults, indignities, threats, annoyances, petty oppression or other trivialities" are not recognized as "outrageous." Bain, 936 S.W.2d at 622.

Plaintiffs' IIED claim fails for one simple reason: they have never had contact with Sheriff Bivens.  Plaintiffs admit as much.  [Plaintiffs' Responses to Defendants' Statement of Material Facts, Doc. 74, at 5, ¶ 19].  Clearly, Sheriff Bivens is not responsible for any "outrageous" conduct, let alone any "conduct."   Accordingly, Plaintiffs' claims for intentional infliction of emotional distress against Sheriff Bivens in his individual capacity are **DISMISSED WITH PREJUDICE.**

### d.  Common Law Negligence Claim for "Failure to Train"

To the extent that Plaintiffs have sued Sheriff Bivens in his individual capacity for common law negligence–once again, based upon a failure to train–that claim is also dismissed.  In order to prevail on a negligence claim, Plaintiffs must establish the following elements: "(1) a duty of care owed by defendant to plaintiff; (2) conduct below the applicable standard of care that amounts to a breach of that duty; (3) an injury or loss; (4) cause in fact; and (5) proximate, or legal, cause." Estate of French v. Stratford House, 333 S.W. 3d 546, 554 (Tenn. 2011) (citation omitted).

Plaintiffs' negligence claim fails for one important reason: Sheriff Bivens did not owe a duty to Plaintiffs, independent of his official status. The following case is instructive.

In Doe v. May, the plaintiff asserted a negligence claim against the sheriff in his individual capacity. No. E2003-1642-COA-R3-CV, 2004 WL 1459402, at *5 (Tenn. Ct. App. Jun. 29, 2004). Like the present case, the negligence claim in May was based upon a "failure to train"–specifically, the "failure to properly train the internal affairs investigators and for conducting a 'wrongful' internal affairs investigation." Id. The court dismissed the negligence claim, explaining that "**absent his official status**, the sheriff has no duty to train the employees in the sheriff's department. Thus, a sheriff cannot be individually liable for failing to train his subordinates." Id. (emphasis added) (citing Riley v. Newton, 947 F.3d 632 (11th Cir. 1996)).

Simply put, Sheriff Bivens cannot be held liable in his individual capacity for breaching a duty that he only owed in his official capacity. Clearly, Sheriff Bivens did not owe Plaintiffs a duty–in his individual capacity–to train his subordinates. That duty only arises under his official status. Consequently, Plaintiffs have failed to show that Sheriff Bivens breached a duty owed to them in his individual capacity. Accordingly, Plaintiffs' negligence claims against Sheriff Bivens in his individual capacity are **DISMISSED WITH PREJUDICE.**

## IV. CONCLUSION

Based upon the foregoing, Defendants' Motion for Summary Judgment [Doc. 67] is **GRANTED.**

50

**IT IS SO ORDERED**.

**ENTER:**

_____s/ Thomas W. Phillips_____
United States District Judge